United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| LOAY S. NASER, | ) | Case No.: 5:10-CV-04475 EJD |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING-IN-PART AND** |
| | ) | **DENYING-IN-PART DEFENDANTS'** |
| v. | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT; DENYING** |
| METROPOLITAN LIFE INSURANCE | ) | **PLAINTIFF'S MOTION FOR** |
| COMPANY, METLIFE ENTERPRISE | ) | **SUMMARY JUDGMENT;** |
| GENERAL INSURANCE AGENCY, INC., | ) | **GRANTING DEFENDANTS'** |
| AND METLIFE SECURITIES, | ) | **MOTION TO STRIKE** |
| | ) | |
| Defendants. | ) | **[Re: Docket Nos. 71, 89, 94]** |
| | ) | |

The above-captioned lawsuit is an employment-related action brought by Plaintiff Loay

Naser ("Naser" or "Plaintiff") against Defendants Metropolitan Life Insurance Company, MetLife

Enterprise General Insurance Agency, Inc., and MetLife Securities, Inc. (collectively "MetLife" or

"Defendant"). Presently before the Court are three motions. MetLife has moved for summary

judgment as to all eight causes of action brought forth by Naser. See Docket Item No. 89. MetLife

has also moved to strike evidence submitted by Naser. See Docket Item No. 71. Naser has moved

for partial summary judgment as to one of his claims for unpaid wages. See Docket Item No. 90.

The Court found this matter suitable for decision without oral argument pursuant to Civil

Local Rule 7-1(b) and previously vacated the hearing. Having fully reviewed the parties' briefings,

and for the following reasons, the Court GRANTS MetLife's Motion to Strike, DENIES Naser's

1

1    Motion for Partial Summary Judgment, and GRANTS-IN-PART and DENIES-IN-PART

2    MetLife's Motion for Summary Judgment.

3

4    **I.        Background**

5            **A.  Factual Background**

6                    **1.   MetLife Insurance Company and Its Incentive Programs**

7            MetLife is a Delaware corporation with its principal place of business in New York. Def.'s

8    Answer to Pl.'s Second Amended Consolidated Complaint ("SACC"), ¶ 5. MetLife deals in

9    insurance and annuities and offers these services through agencies distributed throughout the

10   country. Def.'s Ex. 1, Declaration of Kim Wargaki ("Wargaki Decl.") ¶ 3, Docket Item No. 78.

11   MetLife operates one such agency in San Jose, CA ("E-38"), with satellite offices in Cupertino, CA

12   and Walnut Creek, CA. Def.'s Ex. 25, Deposition of Loay S. Naser, Nov. 16, 2012 ("Naser Dep.

13   11/16") at 162:23–163:2, Docket Item No. 76. Each agency offers its services through Financial

14   Services Representatives ("FSRs"), who earn commission on the sale of insurance and other

15   financial products. Wargaki Decl. ¶ 19. FSRs work under the direction of a local management team

16   headed by a Managing Director. Id. ¶ 3. The management team earns its pay from Performance

17   Based Credits ("PBC")—effectively a type of override on the premiums clients pay. Id. ¶¶ 7, 9.

18           PBC serves both as the source of management pay and as an investment fund from which

19   local management may pay out expenses intended to generate revenue. Id. ¶ 8. PBC does not,

20   however, act as a payment source for the agency's necessary and direct expenses, such as rent,

21   utilities, and insurance, which are paid by MetLife through an independent operating budget. Id. ¶

22   11. As compensation, management may take a percentage draw from PBC. Id. ¶¶ 12–15. MetLife

23   considers a percentage draw over 50% inappropriate and reflective of insufficient investment in the

24   agency. Id. ¶ 23. MetLife recalibrates PBC at regular intervals based on projected growth and a

25   location's percentage achievement of its goal. Id. ¶ 16. MetLife pays its draws based on 85% of

26   projected PBC, leading to an under- or overstatement of payments. Id. ¶ 21. There is therefore a

27

28
     Case No.: 5:10-CV04475 EJD
     ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
     GRANTING DEFENDANTS' MOTION TO STRIKE

necessary delay between the payment of draws and the final assessment of actual PBC. In order to rationalize the difference between the 85% payout of PBC and the actual draw due, MetLife undertakes an annual process called a "true-up." Id. ¶ 18. During a "true-up," amounts due from understated payments are paid out, and any overpayment must be paid back to MetLife. Id.

MetLife awards additional PBC through incentive programs. Id. ¶ 9. One of these is the "super starter" program, which rewards new FSRs for strong performance. Id. ¶ 20. It also motivates management to push the performance of new FSRs by awarding PBC to agency locations for each FSR who achieves super starter status. Def.'s Ex. 1, 2007 Management Compensation Plan Description ("Comp. Plan") at 9, Docket Item No. 78; Def.'s Ex. 5, Deposition of Thomas Ross, May 15, 2012 ("Ross Dep. 5/15") at 50:16–22, Docket Item No. 73; Def.'s Ex. 6, Deposition of Thomas Ross, May 17, 2012 ("Ross Dep. 5/17") at 207:22–208:9, Docket Item No. 74; Def.'s Ex. 7, Deposition of Michael Vietri, July 26, 2012 ("Vietri Dep. 7/26") at 34:19–25:25, Docket Item No. 75.

In addition to the super starter program, MetLife supports new FSRs by assigning existing client accounts to them. Def.'s Ex. 2, Declaration of Michael Vietri ("Vietri Decl.") ¶ 7; Naser Dep. 11/16 at 12:11–18. These are clients whose accounts are "orphaned"—that is, no longer assigned to another FSR because of that FSR's separation from MetLife. Id. Managing Directors typically assign these client accounts evenly across all FSRs in a location, including new FSRs. Vietri Decl. ¶ 8; Naser Dep. 11/16 at 12:11–18.

### 2.  Loay Naser's Employment with MetLife

Loay Naser is a Kuwaiti-born resident of California. SACC ¶¶ 6, 7; Declaration of Loay Naser in Opp'n to Defs.' Mot. for Summ. J. ("Naser Decl. Opp'n") ¶ 2. He describes himself as a Christian of Palestinian/Arab ancestry. Id. ¶ 11. In 1991, he joined MetLife at its Cupertino office as an FSR. Def.'s Ex. 20, Deposition of Loay S. Naser, September 28, 2012 ("Naser Dep. 9/28") at 48:10–11, Docket Item No. 74. At the time of his hire, Naser signed a memorandum

Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS' MOTION TO STRIKE

United States District Court
For the Northern District of California

acknowledging that his employment was "at-will." Naser Dep. 9/28 at 20–21, 25; see also Def.'s Ex. 23, MetLife Disciplinary Action Policy, Docket Item No. 76; Def.'s Ex. 22, Guide to Policies and Procedures at 4, Docket Item No. 76. In 2000, MetLife promoted him and Mike Shami to co-Managing Directors of E-38. Def.'s Ex. 4, Deposition of Loay S. Naser, May 11, 2012 ("Naser Dep. 5/11") at 17:18–22, 63:12–64:10, 166:13–18. In 2007, pursuant to MetLife's perception that Shami was doing too little work to justify allowing him to retain the title of co-Managing Director, the pair was given a set of options: (1) allow Naser to take over as Managing Director, with Shami accepting a demotion to FSR, or (2) separate from MetLife. Id. Naser and Shami chose the first option. Id. Accordingly, MetLife promoted Naser to sole Managing Director of the agency in San Jose ("E-38"). Id.

### 3. MetLife's Special Investigations Unit Investigates Naser's Management of E-38

The series of events underlying the present action commenced in the autumn of 2008. That September, Naser flew to Jordan to attend his father's funeral. SACC ¶ 13. He states that upon his return, he was subjected to derogatory comments about Jordan and his travels there. SACC ¶ 13. Around the same time, Peter Chang, a subordinate FSR in Naser's agency complained to MetLife's Human Resources department ("HR") alleging that Naser forced FSRs to split 25% of their commissions resulting from certain leads with management ("the Chang complaint"). Def.'s Ex. 9, Internal Investigation Report ("Ross Report") at 3, Docket Item No. 75. HR referred the matter to MetLife's Special Investigations Unit ("SIU"). Ross Dep. 5/15 at 15:23–16:19; Def.'s Ex. 3, Declaration of Thomas Ross ("Ross Decl.") Ex. 1, Docket Item No. 73.

In October, 2008, the SIU began its investigation of the Chang complaint. Id. Thomas Ross, then Senior Fraud Investigator, led this investigation (the "Ross investigation"). Id. The Ross investigation lasted through June of 2009, and Ross noted that he had never known an SIU investigation that had lasted so long. Ross Report, Docket Item No. 75. Upon the conclusion of the Ross investigation, Ross issued a final report (the "Ross Report") to the committee overseeing the

4

investigation. Id. This committee consisted of several members included on a high-level

communications distribution list, including Michael Vietri, Executive Vice-President for Individual

Distribution, and Nam Patel from MetLife Human Resources, among others. See Docket Item No.

75, Ex. 9 (distribution list). The Ross Report not only confirmed the accuracy of the Chang

complaint, but revealed many additional violations of MetLife procedures, practices, and policies.

Ross Report, Docket Item No. 75. These included (1) that Naser required FSRs to leave

commission assignment lines on new applications blank so that he could assign 25% of

commissions to management; (2) that Naser had exchanged the assignment of 30,000 orphaned

accounts with an FSR in southern California in return for that FSR's payment of a $70,000 salary

for Naser's secretary; (3) that Naser would require experienced FSRs to assign accounts to new

FSRs in order to help new FSRs achieve super starter status, and that this arrangement required the

new FSRs to repay these commissions to the experienced FSRs in either cash or commission

assignments; (4) that Naser would switch paperwork in order to ensure that new applicants would

pass competency exams; and (5) that Naser had hired a marketing director for the agency, and, as

part of the deal, agreed to personally pay her housing costs—an arrangement never reported to HR

and for which no IRS forms 1099 were ever issued. See Ross Report, Docket Item No. 75. MetLife

management considered this conduct improper, especially because it artificially increased PBC at

E-38. Id.

John Schrieffer and Steve Day, Naser's direct managers, received the Ross Report and,

upon review recommended that Naser and his management team be placed under enhanced

supervision and that Naser and his management team receive no discretionary bonus for 2009; no

recommendation of termination was included. Def.'s Ex. 17, Deposition of John Schrieffer,

September 20, 2012 ("Schrieffer Dep. 9/20") at 252:9–253:15, Docket Item No. 105. Vietri, the

MetLife executive responsible for disciplinary action in this matter, accepted these

recommendations. Def.'s Ex. 12, Deposition of Michael Vietri, July 27, 2012 ("Vietri Dep. 7/27")

Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANTS' MOTION TO STRIKE

United States District Court
For the Northern District of California

1   at 102:7–5, 103, Docket Item No. 77; Def.'s Ex. 13, Docket Item No. 74. Over the following two

2   months, MetLife's HR and Compliance departments developed an enhanced supervision plan. Id.

3          During the Ross investigation, Naser called HR in June of 2009 to complain about

4   discrimination he believed he had suffered on the basis of his national origin, race, and/or

5   perceived religion. Naser Decl. Opp'n ¶¶ 13–17. He cited the length of the investigation as an

6   additional example of this discrimination. Id. The HR representative who fielded the complaint,

7   Patel, did not report this complaint to Vietri. Vietri Decl. ¶¶ 3-4. During a joint conference call

8   among Naser, Patel, and Tony DeCarlo (Ross' supervisor) to discuss these allegations of

9   discrimination, DeCarlo urged Naser to be patient. Naser Decl. Opp'n ¶¶ 13–17.

10

11                  **4.  Naser's Additional Concerns Expressed to Management**

12         While the Ross investigation was ongoing, Naser raised two further issues with MetLife

13  senior management relevant to this case. Naser Decl. Opp'n ¶ 18. The first matter involved a

14  retirement program, called RetireWise, that MetLife offices were responsible for offering to

15  clients. Id. Naser raised concerns to Vietri about whether the program would have potentially

16  caused Naser's FSRs to breach their fiduciary duty to clients. Id. Vietri dispatched MetLife lawyer

17  Gary Simpson to discuss the matter with Naser. Id. No further action was taken on this matter by

18  any party. Id.

19         In addition, during the spring of 2009, Naser complained to his superior, Schrieffer, that

20  Naser had not been timely paid his "true-up" relative to 2008.  Id. ¶ 19. There had been several

21  previous communications back and forth between the two as to what percentage was due payable

22  to Naser as opposed to other managers at E-38. Schrieffer Dep. 9/20 at 62:17–64:8, 68:8–69:15,

23  71:11-1. Schrieffer immediately released this payment after the conversation with Naser.  Naser

24  Dep. 11/16 at 83:9–84:4.

25

26

27

28
    Case No.: 5:10-CV04475 EJD
    ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
    GRANTING DEFENDANTS' MOTION TO STRIKE

### 5.   Additional Complaints against Naser; MetLife's Decision to Terminate

In July 2009 another FSR reporting to Naser, Mary Hanson, complained to HR that Naser had discriminated against her on the basis of age and gender. Def.'s Ex. 15, Deposition of Susan LeClerc, September 18, 2012 ("LeClerc Dep. 9/18") at 12, Docket Item No. 105. HR informed Naser that it would be dispatching Susan LeClerc to investigate the matter (the "LeClerc investigation").   Id. Naser asserts that when he called Patel at HR to file another complaint about continuing discrimination, Patel privately told him she (Patel) felt he was not being treated fairly. Naser Decl. Opp'n ¶ 16.

The LeClerc investigation lasted approximately one month; she interviewed twenty individuals during the investigation. Def.'s Ex. 10, Vietri Dep. 7/26 Ex. E at MET 009624-6925, Docket Item No. 75. LeClerc interviewed Naser roughly halfway through the cadre of interviews. During the course of the LeClerc investigation, LeClerc heard from Amy Anderson, another E-38 employee, who alleged that Naser had other employees take Naser's continuing education exams. Def.'s Ex. 10, Vietri Dep. 7/26 Ex. E at MET 009624-6925. LeClerc, in accordance with normal MetLife practice, referred this matter to SIU for further investigation. Def.'s Ex. 11, Vietri Dep. 7/26 Ex. G, Docket Item No. 75; Def.'s Ex. 7, Vietri Dep. 7/26 at 58; Def.'s Ex. 15, LeClerc Dep. 9/18 at 46:16–22, 150:15–18. SIU assigned Rob Hill to conduct this investigation (the "Hill investigation"). Def.'s Ex. 8, Vietri Dep. Ex. C, Docket Item No. 75; Vietri Dep. 7/26 at 15.

In August, Naser was informed that his agency's budget would be reduced to reflect the cancellation of any discretionary bonus to be awarded to E-38 management for 2009. Schrieffer Dep. 9/20 at 252:9–253:15. During the same time period, the LeClerc and Hill investigations concluded and their respective investigators completed relevant reports (the "LeClerc report" and the "Hill report"). Def.'s Ex. 10, Vietri Dep. Ex. E at MET 009624-6925; Vietri Dep. 7/26 at 22:18 – 23:19. The LeClerc report articulated the LeClerc investigation's procedures and findings at length and ultimately concluded that Naser had not discriminated against Mary Hanson. Def.'s Ex. 16, LeClerc Dep. The Hill report, however, concluded that another employee named Robin

7

1  Archuleta had Naser's account password, that there was no legitimate reason for her to have his

2  password, and that she was likely taking Naser's exams. Vietri Dep. 7/26 at 15.

3      In September, Vietri received the updated LeClerc and Hill reports. Vietri Dep. 7/26 22:18

4  – 23:19. Based on their findings, and in the wake of the lengthy Ross investigation, Vietri made the

5  decision to terminate Naser's employment with MetLife. Id. Because Naser was on vacation during

6  the week of September 7, 2009, MetLife waited until September 14 for the termination. Def.'s Ex.

7  18, Docket Item No. 74 (letter from Schrieffer to Naser confirming Naser's termination); Naser

8  Dep. 9/28 at 53:3–9.

9

10      **B.  Procedural History**

11      On October 4, 2010, Naser filed the present action after exhausting administrative remedies

12  and obtaining a Notice of Right to Sue from the United States Equal Employment Opportunity

13  Commission. See Compl. Docket Item No. 1. The Complaint was amended twice to its present

14  form; the Second Amended Consolidated Complaint ("SACC") contains the following eight causes

15  of action: (1) discrimination on the basis of race or national origin and/or perceived religion in

16  violation of Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§2000e, et seq., and the Fair

17  Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940; (2) harassment on the basis of

18  race or national origin and/or perceived religion in violation of Title VII and FEHA through the

19  creation of a hostile work environment; (3) unlawful retaliation; (4) wrongful termination in

20  violation of California public policy; (5) violation of sections 201 et seq. of the California Labor

21  Code for failure to pay wages upon termination; (6) violation of section 2802 of the California

22  Labor Code for failure to reimburse business expenses; (7) wrongful termination; and (8) unfair

23  competition under section 17200 of the California Business and Professions Code. See SACC ¶¶

24  22–58.

25      On November 28, 2012, the parties filed cross motions for summary judgment. MetLife

26  filed its Motion for Summary Judgment on each of Naser's causes of action. See Def.'s Mot. for

27

28  Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANTS' MOTION TO STRIKE

**United States District Court**
For the Northern District of California

1   Summ. J., Docket Item No. 89. Naser filed his Motion for Partial Summary Judgment on his fifth

2   cause of action (failure to pay wages upon termination) only. See Pl.'s Mot. for Partial Summ. J.,

3   Docket Item No. 94. Additionally, MetLife filed a Motion to Strike pursuant to Federal Rule of

4   Civil Procedure 37. See Docket Item No. 71.

5

6   **II.     Motion to Strike**

7        Naser has submitted various credit card charge records as evidence in support of his Motion

8   for Partial Summary Judgment and in opposition to MetLife's Motion for Summary Judgment

9   regarding his sixth claim which is for MetLife's alleged failure to reimburse business expenses in

10  violation of section 2802 of the California Labor Code. See Docket Item No. 71, Ex. 2 (listing

11  credit card charges). Naser submitted this evidence on November 9, 2012, ten days after the close

12  of discovery and only fourteen days before the summary judgment briefing deadline. See Pretrial

13  Order, Docket Item No. 61; Def.'s Mot. to Strike at 1, Docket Item No. 71. These credit card

14  charge records consist of 467 charges to Naser's personal American Express card displaying only

15  sum totals for each purchase with a variety of merchants in a wide range of locations. Id. None are

16  linked to individual receipts placed in evidence evincing the precise nature of the goods or services

17  purchased. Id. Ex. 2.

18       Federal Rule of Civil Procedure 26 provides that a party which has answered

19  interrogatories, requests for production, or requests for admission during discovery must timely

20  supplement those answers if the party "learns that in some material respect the disclosure or

21  response is incomplete or incorrect, and if the additional or corrective information has not

22  otherwise been made known to the other parties during the discovery process or in writing." Fed.

23  R. Civ. P. 26(e)(1)(A). A party may answer an interrogatory, request for production, or request for

24  admission by specifying the records from which the answers may be obtained and then providing

25  these records. Fed. R. Civ. P. 33(d). The party making the interrogatory "must be given a

26

27                                                    9

28  Case No.: 5:10-CV04475 EJD
    ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
    GRANTING DEFENDANTS' MOTION TO STRIKE

reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries." Fed. R. Civ. P. 33(d)(2).

Rule 37(c) permits the exclusion of evidence improperly withheld under Rule 26 unless the failure to disclose was substantially justified or harmless. Fed. R. Civ. P. 37(c) (a party failing to provide information required under Rule 26(a) or 26(e) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless"); see also Pfingston v. Ronan Eng'g Co., 284 F.3d 999, 1005 (9th Cir. 2002) (noting that if a party had been able to show prejudice and/or unfair surprise as a result of his opponent's failure to disclose information pursuant to Rule 26(e)(1), the district court could have properly barred its use at summary judgment). The burden of showing harmlessness rests with the non-moving party. Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1106–07 (9th Cir. 2001). A showing of prejudice to the moving party will demonstrate that the opposing party's failure to disclose was not harmless or justified. Cambridge Elecs. Corp. v. MGA Elecs., Inc., 227 F.R.D. 313, 324 (C.D. Cal. 2004). Courts have broad discretion in granting motions to strike evidence under Rule 37(c)(1). Yeti by Molly, 259 F.3d at 1106.

As an initial matter, the Court finds that Naser was under such an obligation to produce pursuant to Rule 26(e). Namely, Naser's original complaint, dated October 4, 2010, contained an allegation that Naser had not been "reimbursed for all of his MetLife related expenses . . ." Compl. ¶ 23. In response, MetLife served a Rule 34 interrogatory on Naser, seeking "DOCUMENTS supporting or relating to the allegation that: '. . . [Naser] . . . was not reimbursed for all of his Met Life related expenses . . .'" See Def.'s Mot. to Strike, Ex. 3 (denominated "Defendants' First Set of Information and Document Requests to Plaintiff"), Docket Item No. 71. Naser responded with the claim that the information pertaining to this allegation was attorney-client privileged or otherwise available to MetLife through its own records. See Def.'s Mot. to Strike, Ex. 4 (denominated "Plaintiff's Objections and Responses to Defendants' First Set of Information and Document Requests to Plaintiff"), Docket Item No. 71. At no time did Naser supplement his answers.

10

Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANTS' MOTION TO STRIKE

United States District Court
For the Northern District of California

1    However, when Naser added his claim for unreimbursed business expenses under section 2802 of

2    the California Labor Code on December 12, 2011, he had a duty to amend his discovery responses

3    with any material information that would make relevant disclosures complete or correct. See Fed.

4    R. Civ. P. 26(e). MetLife had no knowledge in its own records about many of the submitted

5    charges (such as personal vacation receipts, and season tickets to local sports venues (see Def.'s

6    Mot. to Strike at 5)) because none of these charges had previously been communicated to MetLife.

7    See Def.'s Mot. to Strike at 2 (noting that MetLife had scrutinized Naser's employee file and found

8    no receipts for expenses and no denials of requests for reimbursement). As such, Naser's attempt to

9    introduce these apparently new records in November 2012 occurred almost one year after Naser

10   had an obligation to disclose them and after the close of discovery.

11          As noted, when a party fails to timely meet the obligation under Rule 26(e), Rule 37(c)'s

12   sanctions preclude that party from introducing this evidence, unless the failure to disclose was

13   substantially justified or harmless. Fed R. Civ. P. 37(c); Yeti by Molly, 259 F.3d at 1106;

14   Cambridge Elecs., 227 F.R.D. at 321–24. In order to forestall Rule 37(c) sanctions striking these

15   credit card receipts as evidence, Naser first argues that MetLife has not been harmed by the

16   lateness of his disclosure. The Court disagrees. Prejudice and surprise, the ability of the harmed

17   party to cure the prejudice, the likelihood of disruption at trial, and willfulness in not timely

18   disclosing evidence are all factors the Court may consider in determining "harmlessness." See

19   Voltera Semiconductor Corp. v. Primarion, Inc., No. C-08-05129, 2012 WL 5932733, *2 (N.D.

20   Cal. Nov. 27, 2012) (listing factors). While, MetLife was able to question Naser about the credit

21   card records at his additional November 16, 2012 deposition, this deposition was originally

22   scheduled to address many other issues, not solely the question of allegedly unreimbursed business

23   expenses. See Discovery Order, Docket Item No. 63. Given the relatively undetailed information in

24   the credit card charge report, MetLife has not had a meaningful opportunity to depose Naser on the

25   topic. Moreover, MetLife had only dedicated part of one sentence to this topic in its argument for

26   additional deposition time with Naser. See Discovery Letter Brief, Docket Item No. 62. Instead,

27

28
Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANTS' MOTION TO STRIKE

1    MetLife was forced to alter its deposition strategy at the last minute to accommodate the tardy

2    production of Naser's credit card records.

3          In the alternative, Naser argues that his delay was substantially justified. Naser contends

4    that because MetLife had also produced information late, Naser was permitted to do the same.

5    Naser cites to no authority in support of the proposition that an opponent's dilatory conduct

6    justifies delaying the production of documents Naser himself had an obligation to make available.

7    Cf. Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1028 (9th Cir. 2003) (noting that a "rash of

8    discovery" shortly before the cut-off date did not justify earlier failure to disclose). Moreover,

9    Naser's own testimony demonstrates that Naser was easily able to produce these credit card

10   records—all it required was calling American Express and having them "walk [him] through it" so

11   that he could "go online and [] order[] them." See Naser Dep. 11/16 at 119.

12         Accordingly, because the Court finds that Naser's delay in producing the credit card records

13   at issue here was neither harmless nor substantially justified, the Court GRANTS Defendant

14   MetLife's Motion to Strike Evidence Improperly Withheld.

15

16   **III.    Motions for Summary Judgment**

17        **A.  Legal Standard**

18        A court shall grant a motion for summary judgment if "there is no genuine dispute as to any

19   material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A

20   material fact is one that would affect the outcome of the proceedings. Anderson v. Liberty Lobby,

21   Inc., 447 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the

22   absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

23        If the moving party meets this initial burden, the non-moving party must then go beyond the

24   pleadings to designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

25   56(e); Celotex, 477 U.S. at 324; see also Liberty Lobby, 447 U.S. at 249–50 (noting that the non-

26   moving party bears the burden of producing more than "a scintilla of evidence" of a triable issue of

27

28
Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANTS' MOTION TO STRIKE

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

material fact in its favor). The court must regard as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. <u>Celotex</u>, 477 U.S. at 324. Such evidentiary material must consist of admissible evidence. Fed. R. Civ. P. 56(c); <u>see also</u> <u>Hal Roach Studios, Inc. v. Feiner & Co.</u>, 896 F.2d 1542, 1550 (9th Cir. 1990). Merely suggesting that facts are in controversy, or highlighting conclusory or speculative testimony, is insufficient to defeat summary judgment. <u>See</u> <u>Thornhill Publ'g Co. v. GTE Corp.</u>, 594 F.2d 730, 738 (9th Cir. 1979).

Rather, a genuine issue for trial exists when the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. <u>Liberty Lobby</u>, 477 U.S. at 248–49; <u>Barlow v. Ground</u>, 943 F.2d 1132, 1134–36 (9th Cir. 1991). By contrast, a court must grant summary judgment when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.

### B.  Claims Stipulated Dropped (Claims 1 and 2)

During Naser's November 16, 2012 deposition, he stipulated that he would no longer pursue his first and second causes of action, alleging violations of FEHA and Title VII stemming from allegations of MetLife's creation of a hostile work environment, harassment, and discrimination on the basis of race and/or national origin and perceived religion. Naser Dep. 11/16 at 5:16–6:7; <u>see also</u> Def.'s Mot. for Summ. J. at 12. As such, the Court GRANTS MetLife's Motion for Summary Judgment with regard to claims 1 and 2 of the SACC.

### C.  Unlawful Retaliation and Wrongful Termination Claims (Claims 3 and 4)

Naser alleges two analytically related causes of action: unlawful retaliation in violation of FEHA and/or Title VII (claim 3), and wrongful termination in violation of California public policy (claim 4). To establish a <u>prima facie</u> case of unlawful retaliation or wrongful termination, a

13

Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS' MOTION TO STRIKE

plaintiff must show "(1) involvement in a protected activity, (2) an adverse employment action, and (3) a causal link between the two." <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 928 (9th Cir. 2000). If a plaintiff meets this burden, the defendant must put forth a legitimate, non-discriminatory reason for the adverse employment action; if that is accomplished, the plaintiff must then show that the stated reason is pretext. <u>Id.</u>; <u>see also</u> <u>Crown v. Wal-Mart Stores, Inc.</u>, 8 F. App'x 776, 778 (9th Cir. 2001) (holding that a plaintiff to a retaliation complaint has the burden of proving—in addition to the engagement in protected activity and the causal link between that activity and the retaliatory conduct—that the employer's explanation for the action was a pretext for the illegal consequence).

As an initial matter, the Court notes that Naser has met the first two prongs of the <u>prima facie</u> case. First, Naser's complaints to management about his concerns regarding the legality of the RetireWise program and to HR about discrimination on the basis of race and/or national origin and perceived religion qualify as protected activity in the context of a wrongful or retaliatory termination suit. <u>See</u> 42 U.S.C. §§ 2000e-2(a)–2000e-3(a) (2012) (describing activity protected against adverse employment action under Title VII); Cal. Gov. Code § 12940(a) (West 2012) (describing activity protected against adverse employment action under FEHA); <u>see also</u> <u>Reeves v. Safeway Stores, Inc.</u>, 121 Cal. App. 4th 96 (2004); <u>Walker v. Grand Energy Servs., LLC</u>, 726 F. Supp. 2d 1091, 1102 (E.D. Cal. 2010). MetLife subjected him to an adverse employment action in the form of his involuntary termination. <u>See</u> 42 U.S.C. §§ 2000e-2(a)–2000e-3(a) (describing adverse employment actions in Title VII complaints); Cal. Gov. Code § 12940(a) (listing prohibited adverse employment actions under FEHA); <u>Nidds v. Schindler Elevator Corp.</u>, 113 F.3d 912, 917 (9th Cir. 1996) (disposing of a FEHA claim); <u>Rose v. Wells Fargo & Co.</u>, 902 F.2d 1417, 1421 (9th Cir. 1990); <u>Guz v. Bechtel Nat'l, Inc.</u>, 24 Cal. 4th 317, 355 (2000).

Naser, however, has not sufficiently demonstrated the third prong in that he has failed to show a causal link between the protected activity and his termination. Naser has not produced sufficient evidence that (1) the link exists and (2) that MetLife's stated reason for termination was

14

1    pretextual. See Brooks, 229 F.3d at 928 (holding that a defendant may defeat a plaintiff's prima

2    facie case by putting forth a legitimate, non-discriminatory reason for the adverse employment

3    action); see also Crown v. Wal-Mart Stores, Inc., 8 F. App'x 776, 778 (9th Cir. 2001) (holding that

4    the plaintiff in a retaliation suit bears the burden of proving that the employer's proffered

5    explanation for the adverse employment action was a pretext).

6         MetLife explains that it terminated Naser after a series of investigations into Naser's

7    breaches of MetLife business practices. During deposition, Vietri asserted that he based his

8    decision to terminate Naser on the totality of the circumstances, and that MetLife considered

9    Naser's actions improper and in breach of the company's policies. Docket Item No. 75, Vietri Dep.

10   7/26 at 11:8–9, 22:18–23:19, 76:22–78:8. He did not base the decision solely on the Ross Report.

11   Id. Instead, the results of the Ross Report, coupled with Vietri's understanding of the LeClerc

12   investigation and the Hill investigation, led Vietri to decide to terminate Naser. Id. Poor

13   performance and violation of company policies or procedures, such as those that prompted Vietri's

14   decision, are typical, non-discriminatory reasons justifying adverse employment action. Villiarimo

15   v. Aloha Island Air, Inc., 281 F.3d 1054, 1062–64 (9th Cir. 2002) (finding that violation of

16   company policies and procedures is a non-discriminatory reason for termination).

17        Moreover, MetLife contends that Vietri had no knowledge of Naser's complaints to HR

18   involving discrimination on the basis of his race and/or national origin and perceived religion;

19   Naser has failed to demonstrate otherwise. In support of its contention, MetLife points to Vietri's

20   testimony. By declaration, Vietri asserts that Patel had never informed him of any of Naser's

21   complaints to HR. Vietri Decl. ¶ 3. Without this knowledge, Naser cannot establish the necessary

22   causation of his prima facie case. Morgan v. Regents of the Univ. of Cal., 88 Cal. App. 4th 52

23   (2000) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had

24   engaged in the protected activity.") In the absence of evidence of any conversations, corroborating

25   testimony, or other affirmative evidence to establish the causal link between Naser's complaints

26   and his termination, his claim fails not only to show pretext, but also to show the causation

27

28

Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANTS' MOTION TO STRIKE

United States District Court
For the Northern District of California

1   necessary to his prima facie case. Cf. Walker, 726 F. Supp. 2d at 1102 (denying defendant

2   summary judgment where plaintiff could point to supervisor's angry reaction to complaints and co-

3   worker's testimony corroborating the alleged causal link); Reeves, 121 Cal. App. 4th 96 (accepting

4   as evidence of a triable issue of material fact affirmative evidence presented by plaintiff that tended

5   to call into question the cause-in-fact of plaintiff's termination).

6          In attempting to establish his prima facie case and oppose Defendant's Motion, Naser offers

7   several arguments, each of which will be addressed in turn. First, in support of his pretext

8   argument, Naser points to the shortness in time between his complaints and his termination.

9   Indeed, only a few months elapsed between Naser's complaint to HR of discrimination and his

10  termination. Approximately a year passed between Naser's complaint to Vietri about the legality of

11  the RetireWise program and his termination. While this temporal proximity lowers the burden on

12  Naser in proving the causal link between his protected activity and his termination, it does not

13  erase it. See, e.g., Passatino v. Johnson & Johnson Consumer Prods., Inc., (9th Cir. 2000);

14  Wysinger v. Automobile Club of S. Cal., 157 Cal. App. 4th 413, 427 (2007). Courts are

15  admonished against mechanically applying such temporal proximity to supply an inference of

16  retaliation. Anthione v. N. Cent. Counties Consortium, 605 F.3d 740, 751 (9th Cir. 2010) (citing

17  Coszalter v. City of Salem, 320 F.3d 968, 977-78 (9th Cir. 2003)). Instead, Naser must "adduce

18  substantial additional evidence from which a trier of fact could infer the articulated reasons for the

19  adverse employment action were untrue or pretextual." Loggins v. Kaiser Permanente Int'l, 151

20  Cal. App. 4th 1102, 1113 (2007); see also Barefield v. Bd. of Trustees of Cal. State Univ.,

21  Bakersfield, 500 F. Supp. 2d 1244, 1272 (E.D. Cal. 2007); Yanowitz v. L'Oreal USA, Inc., 36 Cal.

22  4th 1028, 1046 (2005).

23          Second, Naser asserts that he can adduce such additional evidence by pointing out that

24  Vietri knew about Naser's complaint regarding the legality of the RetireWise program.[1] However,

25

26  [1] No other evidence exists beyond the temporal proximity between Naser's expressing concern about the program and his termination to supply the inference of retaliatory intent on the part of MetLife. Indeed, Naser's moving papers dedicate scant space to the argument that Vietri terminated Naser on account of Naser's voiced concerns about the

27

                                                    16
28  Case No.: 5:10-CV04475 EJD
    ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
    GRANTING DEFENDANTS' MOTION TO STRIKE

**United States District Court**
For the Northern District of California

1    this amounts to no more than a restatement of his argument involving temporal proximity. This is

2    not "substantial additional evidence." See Loggins, 151 Cal. App. 4th at 1113; Barefield, 500 F.

3    Supp. 2d at 1272.

4         Third, Naser contends that Patel's knowledge of Naser's complaints about workplace

5    discrimination on the basis of race and/or national origin and perceived religion should be imputed

6    to Vietri because they sat on the same committee that oversaw the Ross investigation. However,

7    Naser presents no evidence to support the assertion that his own subordinates influenced Vietri's

8    decision-making process. Naser asserts that Patel told him she personally thought the investigation

9    into Naser was unfair. The Ross Report, a product of the investigatory committee on which Patel

10   and Vietri sat, recommended enhanced supervision but not termination. It is undisputed that Vietri

11   accepted the recommendations of the Ross Report. Naser has not presented sufficient evidence that

12   Patel influenced Vietri's decision to terminate, which was based on occurrences and events beyond

13   the Ross Report.

14        Finally, Naser claims that Vietri's conclusions about MetLife's additional investigatory

15   reports were wrong, and that his choice to terminate after receiving these reports constitutes

16   evidence showing pretext. A plaintiff in Naser's situation, however, must show more than that the

17   employer's decision was "wrong, mistaken, or unwise." Morgan v. Regents of the Univ. of Cal., 88

18   Cal. App. 4th 52, 75–76 (2000); see also Villiarimo, 281 F.3d at 1062–63 (summary judgment in

19   favor of defendant employer appropriate where plaintiff employee could only challenge the

20   business judgment of the employer in taking the adverse employment action).

21        For these reasons, because Naser has failed to show that there exists a genuine issue of

22   material fact on claims 3 and 4 of the SACC, Defendant MetLife's Motion for Summary Judgment

23   with regard to these two claims is GRANTED.

24   _____

25   RetireWise program or the delay of his "true-up" payment. Naser has also admitted that his "true-up" was paid. See
     Discussion Part I.A.4, supra. Naser also appears to argue that MetLife retaliated against him by cutting his pay when it

26   reduced his draw after the issuance of the Ross Report. To the extent that this argument forms part of his third and
     fourth causes of action, MetLife had a clear non-discriminatory reason for doing so: E-38 was overdrawn by several
     hundred thousand dollars. See Schrieffer Dep. 9/20 at 252–56.

27                                                    17

28   Case No.: 5:10-CV04475 EJD
     ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
     GRANTING DEFENDANTS' MOTION TO STRIKE

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D.  Wrongful Termination in Violation of an Implied-in-Fact Employment Contract (Claim 7)**

In claim 7 of the SACC, Naser alleges that Vietri's decision to terminate him violated an implied-in-fact employment contract requiring MetLife to follow certain termination procedures. During Vietri's July 26 deposition, Vietri stated that he believed he could not terminate Naser for simply any reason, but rather for good cause only. See Docket Item No. 75, Vietri Dep. 7/26 at 27:23–25, 28:10–12. Naser argues that this testimony binds MetLife pursuant to Federal Rule of Civil Procedure 30(b)(6), which requires a corporation to designate a representative to testify on its behalf in response to requests for discovery from opposing counsel. See Fed. R. Civ. P. 30. Naser asserts that this testimony accordingly constitutes an admission on the part of MetLife that it operated under an implied-in-fact contract to terminate Naser only for cause. Naser contends that MetLife therefore violated this contract when it terminated him without the predicate cause.

The Court rejects Naser's argument. Under California law a company may disclaim any contract of employment by employing individuals "at will." Guz, 24 Cal. 4th at 340–45. A company's general at-will disclaimer is sufficient to prevent the formation of an implied-in-fact employment contract even when the company's president testifies that he believes he can only terminate an employee for cause. Id. at 345. It would require instead a widespread understanding on the part of employees that a company that uses a general at-will disclaimer nonetheless only terminates for cause. Id.; see also Diyorio v. Am. Tel. & Telegraph. Co., 242 F. App'x 450, 453 (9th Cir. 2007) (citing Guz, 24 Cal. 4th at 340–45); Dalton v. Straumann Co. USA, No. C-99-4579 VRW, 2001 WL 590038, *8 (N.D. Cal. May 18, 2001).

Naser offers insufficient evidence to support his theory that MetLife operated under an implied-in-fact contract to terminate only for cause, especially as against the overwhelming contrary evidence MetLife has submitted. Naser offers only the testimony of Vietri during his deposition in support of this implied-in-fact contract theory. He offers no correlating testimony from fellow employees that supports his contention that MetLife only terminates for cause. By contrast, MetLife's employee handbook materials include "at-will" notices; Naser signed "at-will"

18

**United States District Court**
For the Northern District of California

acknowledgments and was repeatedly informed that all employment at MetLife was deemed "at-will." Docket Item Nos. 74, 76, Naser Dep. 9/28 at 20–21, 25; Def.'s Ex. 23, MetLife Disciplinary Action Policy, Docket Item No. 76.; Def.'s Ex. 22, Guide to Policies and Procedures at 4. Therefore, as in <u>Guz</u>, finding an implied-in-fact employment contract here would "fl[y] in the face of [the company's] general disclaimer"—its "at will" notice, of which Naser was repeatedly made aware. <u>Guz</u>, at 345.

Naser has admitted that MetLife never entered into an agreement to modify his "at-will" status and that it was his understanding that the "company had the ability or the right to terminate employees immediately if, in its judgment, it believed the offense warranted immediate termination[.]" <u>See</u> Naser Dep. 9/28 at 21:22–24, 24:13–16, 25:13–16, 28:6–12.  This acknowledgment alone would substantiate granting summary judgment in favor of MetLife.  <u>See</u> Pomeroy v. Wal-Mart Stores, Inc., 834 F. Supp. 2d 964, 973-977 (E.D. Cal. 2011) (granting summary judgment granted on breach of implied-in-fact employment contract theory of liability where plaintiff acknowledged at-will employment policies).

Accordingly, the Court GRANTS Defendant MetLife's Motion for Summary Judgment with regard to claim 7.

### E.  Claim Involving Unpaid Wages (Claim 5)

With regard to claim 5 of the SACC, the Court first notes that Naser has narrowed his claims under section 201 of the California Labor Code by withdrawing those pertaining to unpaid vacation and bereavement pay. Naser Dep. 11/16 at 5:16–6:7. As such, claim 5 consists only of the allegation that MetLife failed to pay Naser $40,000 in wages in violation of section 201. According to Naser, MetLife represented that it would credit E-38 the sum of $40,000 in recompense for the way in which Shami's demotion and vacation pay were handled, but never did so. Naser argues that this $40,000 sum constitutes his wages under the Labor Code and that MetLife's continuing failure to pay it triggers liability under sections 201 and 203. MetLife disputes that this amount

Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS' MOTION TO STRIKE

1    (and PBC per se) constitutes wages at all. MetLife notes that its employee manuals plainly state

2    that PBC "is not manager-specific compensation." However, Naser underscores that PBC was the

3    sole mechanism through which he was paid. Both parties have moved for summary judgment on

4    Naser's unpaid wages claim.

5

6                    **1.   Naser's Motion for Summary Judgment on Claim 5**

7            Naser's first argument is that MetLife's PBC compensation system is unlawful under

8    section 2802 of the California Labor Code. This statute requires an employer to "indemnify his or

9    her employee for all necessary expenditures or losses incurred by that employee in direct

10   consequence of the discharge of his or her duties." Cal. Labor Code § 2802(a). An employment

11   compensation system which deducts company losses and expenses from employee base pay runs

12   afoul of California public policy. Prachasaisoradej v. Ralph's Grocery Co., 165 P.3d 133 (Cal.

13   2007) (interpreting the similarly worded Cal. Labor Code §§ 221, 400–410). Specifically,

14   employees cannot be held liable for shrink or cash shortfalls unless these losses can be personally

15   attributed to their negligence or recklessness. See id. at 135–36, 141 (citing Hudgins v. Neiman

16   Marcus Group, Inc., 34 Cal. App. 4th 1109, 1123 (1995)). The same is not true of bonus

17   compensation plans, where these are based on overall profitability and used to then determine a

18   bonus paid over and above base pay. Id.

19          Naser asserts that in order to calculate PBC, from which his base pay is exclusively drawn,

20   MetLife must inevitably factor in business expenses and accordingly deduct them from PBC. Naser

21   argues that this deduction violates section 2802 under the authority offered by Prachasaisoradej.

22   The Court disagrees. Regardless of whether PBC constitutes Naser's wages under section 201

23   (which will be discussed below), the evidence indisputably describes the PBC compensation

24   regime as "an override on gross premiums." Wargacki Decl. ¶ 3. An override, as it entered the

25   business lexicon in the 1930s, is "a commission paid to managerial personnel on sales made by

26   subordinates." Merriam-Webster's Collegiate Dictionary 885 (11th ed. 2003). Similarly, a

27

28
                                                    20
     Case No.: 5:10-CV04475 EJD
     ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
     GRANTING DEFENDANTS' MOTION TO STRIKE

**United States District Court**
For the Northern District of California

1  commission is "a fee paid to an agent or employee for transacting a piece of business or performing

2  as service; <u>esp.</u>: a percentage of the money received from a total paid to the agent responsible for

3  the business." <u>Id.</u> at 249 (emphasis in original). As such PBC merely describes a commission paid

4  to management on the base sales (gross premiums) generated by local agency employees. The

5  Labor Code specifically grants sanction to commission pay regimes. <u>See</u> Cal. Labor Code § 200.

6  What Naser draws in wages from PBC, therefore, is a discretionary percentage of a

7  commission. In addition, MetLife's structure for reimbursing the necessary business expenses—

8  with which section 2802 and <u>Prachasaisoradej</u> are concerned—pays these expenses through a

9  separate account. Wargacki Decl. ¶ 11. In fact, the company's handbook admonishes managing

10  directors against paying even supplemental expenses themselves. <u>See</u> Comp. Plan, Docket Item

11  No. 81. ("The Company will directly reimburse the vendor, seller, speaker, etc. <u>Do not pay the bill</u>

12  <u>yourself and submit this for expense reimbursement.</u>") (emphasis in original). In short, none of the

13  expenses that preoccupied the <u>Prachasaisoradej</u> court—i.e. forcing employees to pay for shrink or

14  cash shortfalls, or other basic costs of doing business—are the kinds of expenses paid out through

15  PBC. <u>Prachasaisoradej</u>, 165 P.3d at 135–36. Rather, PBC allows managing directors a

16  discretionary fund from which they may pay themselves, other managers, and spend money to spur

17  additional business. Wargacki Decl. ¶ 11. As such, the Court rejects Naser's argument that the PBC

18  compensation system is unlawful under section 2802.

19  Naser next contends that PBC constitutes wages under California Labor Code section 200

20  and that MetLife failed to pay him wages due upon termination, in violation of section 201. Section

21  200 defines wages as "all amounts for labor performed by employees of <u>every description</u>, whether

22  the amount is fixed or ascertained by the standard of time, task, piece, <u>commission basis, or other</u>

23  <u>method of calculation.</u>" Cal. Labor Code § 200 (emphasis added).  Section 201 requires employers

24  to immediately pay terminated employees "wages earned and unpaid at the time of discharge." <u>Id.</u>

25  § 201(a). Section 203 imposes additional liability on employers for willfully failing to pay unpaid

26  wages in violation of section 201. <u>Id.</u> § 203(a).

27

28
Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANTS' MOTION TO STRIKE

1    The Court has already noted that PBC functions in the same way as commission, which is

2    defined as wages in the Labor Code. See Cal. Labor Code § 200. In the abstract, at least, some part

3    of PBC therefore constitutes wages under the Labor Code. The problem with Naser's theory is his

4    claim that the entire $40,000 allegedly directed as E-38's PBC are necessarily his wages. MetLife

5    has offered evidence showing that a significant portion of PBC should be used to generate

6    additional revenue and is used to pay other managerial staff. See Wargacki Decl. ¶ 23 (listing

7    standard expected draw percentage rates and expected adjustments); Docket Item No. 83. It is left

8    to the discretion of each managing director as to how much PBC should be used for this purpose

9    and how much should be drawn as wages for each member of management. Id. Naser asserts that

10   he would have paid himself the full $40,000. Declaration of Loay Naser in Supp. of Mot. for

11   Partial Summ. J. ("Naser Decl. Supp.") ¶¶ 16–18. However, given that the proposed sources of this

12   PBC were investment oriented it is questionable whether any of this sum of $40,000 was intended

13   to be Naser's wages. The question of whether monies, which may be used either as business

14   investment, or as personal pay at the discretion of the employee, constitute wages under sections

15   200 and 201 is a question of fact. See On-Line Power, Inc. v. Mazur, 149 Cal. App. 4th 1079, 1087

16   & n.7 (2007) (reserving as a question of fact whether payment separately made to an employee as a

17   contracting consultant separate and apart from his payment as an employee constitutes wages under

18   section 201).

19   Therefore, it remains a question of fact as to whether the $40,000 at issue constitutes

20   Naser's wages for which he was allegedly not paid. As such, Naser's motion for summary

21   judgment on claim 5 is DENIED.

22

23   **2.   MetLife's Motion for Summary Judgment on Claim 5**

24   MetLife asserts that it should be granted summary judgment in its favor on Naser's unpaid

25   wages claim for two reasons, each of which will be addressed in succession. First, MetLife argues

26   that the chain of emails in which various members of MetLife's senior management reiterate a

27

28   Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANTS' MOTION TO STRIKE

commitment to credit E-38's PBC with $40,000 is too vague as to constitute a promise to pay

wages. See Naser Decl. Supp. ¶¶ 8–10, Exs. 1-3.[2] MetLife underscores that the email chains does

not clearly state why a credit to E-38 is due.  See Docket Item No. 94, Exs. attached to Pl.'s Mot.

for Partial Summ. J. at MET007104-MET007107 (referring to Tony Nugent's (MetLife Senior

Vice-President) understanding of Naser's "arrangement" with Rich Morosco (Naser's boss at the

time of the Shami demotion), and emphasizing his confusion over pay to some employees, and

asking about staffing and investment needs) (quotations in original). Indeed, the sourcing of these

funds was originally intended to come from a local office development fund ("SODF"), which

MetLife maintained for special projects. By contrast, at no time did MetLife offer to credit E-38's

PBC from funds specifically designed to offset incorrectly paid commissions, as it did for FSRs in

E-38 in the wake of the Ross investigation. Naser contends, however, that given his

communication with Harry Axford (his immediate superior at the time of the original

representation, who allegedly told him that Naser had effectively paid for Shami's vacation time,

MetLife understood these payments to be for Naser's wages. Therefore, there exists a question of

fact as to whether the PBC credits owed to E-38 were intended to be Naser's wages.

　　　　MetLife also argues that regardless of any issue of material fact as disputed between the

parties, Naser's claim is time-barred by the statute of limitations. MetLife contends that the

agreement between Naser and his supervisor to credit $40,000 to E-38's PBC was broken in

March, 2008 when Cavanaugh emailed Naser that MetLife would not award $40,000 in special

development fund credits to E-38's PBC. By bringing suit in December, 2011, MetLife argues, the

three-year statute of limitations forestalls Naser's unpaid wages claim. See Cal. Civ. Proc.

§ 338(a); Pineda v. Bank of Am., 50 Cal. 4th 1389, 1395 (2010) (noting that a three-year statute of

---

[2] Naser asserts by declaration that he and Sean Cavanaugh (a MetLife executive two levels superior to Naser's position) had spoken at a round robin in San Francisco regarding $40,000 that was to be credited to E-38's PBC from the Special Office Development Fund ("SODF"). In the relevant email chain Naser submits, neither Cavanaugh nor any other executive disavow owing money to E-38. In fact, Cavanaugh responds as follows in an email dated March 17, 2008: "We should talk on Friday – for the most part SODF does not exist in 2008. We will need to come at this situation from a different angle…" Naser Decl. Supp. Ex. 1-3 (ellipses in original).

Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANTS' MOTION TO STRIKE

1    limitations governs actions pursuing unpaid wages). Naser, however, points to the original email

2    from Cavanaugh, which reiterated MetLife's commitment to credit E-38's PBC; that email merely

3    acknowledged that it could not come from the special development fund because the fund

4    effectively was unavailable in 2008. Naser Decl. Supp. ¶ 12, Ex. 2 ("[F]or the most part SODF

5    does not exist in 2008. We will need to come at this situation from a different angle."); Docket

6    Item Nos. 93–94. Naser asserts that MetLife maintained this commitment through communications

7    up until his termination on September 14, 2009. MetLife offers no evidence of the contrary or of

8    communications rescinding this commitment until after Naser's termination. Naser Decl. Supp.

9    ¶¶ 12–13, Ex. 2; see also Docket Item No. 94 (containing email communications); Docket Item No.

10   91 (exhibiting letters between counsel for both parties in which Naser maintains his claim to

11   $40,000 in PBC). The Court, therefore, agrees with Naser that the three-year statute of limitations

12   does not bar his unpaid wages claim.

13          Having found a genuine issue of material fact regarding the issue of the $40,000 at issue,

14   the Court DENIES MetLife's Motion for Summary Judgment with regard to claim 5.

15

16          **F.  Claim Involving Failure to Reimburse (Claim 6)**

17          Section 2802 of the California Labor Code requires employers to indemnify employees for

18   all "necessary and reasonable" business expenses incurred in the scope of their employment. Cal.

19   Labor Code § 2802. However, "before an employer's duty to reimburse is triggered, it must either

20   know or have reason to know that the employee has incurred an expense." Stuart v. RadioShack

21   Corp., 641 F. Supp. 2d 901, 904 (N.D. Cal. 2009); Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal.

22   4th 554, 568–69 (2007) ("[W]hether . . . [an] expense was 'necessary' . . . depends on the

23   reasonableness of the employee's choices.").

24          Here, the only evidence Naser offers in support of his section 2802 claim, is that he

25   personally paid for things such as flowers and cable television service for the E-38 office using his

26

27

28
                                                          24
     Case No.: 5:10-CV04475 EJD
     ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
     GRANTING DEFENDANTS' MOTION TO STRIKE

personal funds.[3] He contends that MetLife either knew or had reason to know of his expenses because various MetLife executives and auditors had visited E-38. In this instance, however, none of these individuals would have "know[n] or had reason to know that [Naser] had incurred an expense" because it was the policy of the company to pay out such expenses through PBC. See Wargacki Decl. ¶ 8; see also Stuart, 641 F. Supp. 2d 901. This leaves Naser without evidence of any necessary and reasonable business expenses resulting from his employment with MetLife.

As such, Naser has failed to meet his evidentiary burden, and the Court GRANTS MetLife's Motion for Summary Judgment with regard to claim 6.

### G.  UCL Claim (Claim 8)

California's Unfair Competition law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq., allows a plaintiff to "borrow" violations of other laws involving "business practices" and make them separately actionable. Farmers Ins. Exchange v. Superior Court, 2 Cal. 4th 377, 383 (1996). The UCL requires a plaintiff to show that the defendant participated in a business practice, that such practice was unlawful at the time, id. (citing Barquis v. Merchants Collection Ass'n, 7 Cal. 3d 94, 113 (1972)), and that he lost money or property as a result. See Cal. Bus. & Prof. Code § 17204. Here, the Court has determined that there remain genuine issues of disputed material fact as to Naser's fifth cause of action for unpaid wages. Because this alleged violation of the Labor Code constitutes injury-in-fact and involves actual loss of money, there may therefore be an appropriate predicate legal violation which the UCL claim may borrow. As such, the Court DENIES Defendants' Motion to for Summary Judgment with regard to claim 8.

### IV.   Conclusion and Order

For the reasons explained above, the Court orders the following:

---

[3] Naser submits as evidence of such expenses 467 American Express credit card charges. The Court, however, has struck these records, and they are therefore not considered here.

25

Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANTS' MOTION TO STRIKE

United States District Court
For the Northern District of California

1   Defendant MetLife's Motion to Strike is GRANTED.

2   Defendant MetLife's Motion for Summary Judgment is GRANTED-IN-PART and

3   DENIED-IN-PART. Defendant MetLife's Motion for Summary Judgment is GRANTED with

4   respect to the following causes of action: discrimination on the basis of race or national origin

5   and/or perceived religion in violation of Title VII and FEHA (claim 1); harassment on the basis of

6   race or national origin and/or perceived religion in violation of Title VII and FEHA through the

7   creation of a hostile work environment (claim 2); unlawful retaliation (claim 3); wrongful

8   termination in violation of California public policy (claim 4); violation of section 2802 of the

9   California Labor Code for failure to reimburse business expenses (claim 6); and wrongful

10  termination (claim 7). Defendant MetLife's Motion for Summary Judgment is DENIED with

11  respect to the following causes of action: violation of sections 201 et seq. of the California Labor

12  Code for failure to pay wages upon termination (claim 5); and unfair competition under section

13  17200 of the California Business and Professions Code (claim 8).

14  Plaintiff Naser's Motion for Partial Summary Judgment is DENIED.

16  **IT IS SO ORDERED.**

17  Dated: July 31, 2013



EDWARD J. DAVILA
United States District Judge

26

Case No.: 5:10-CV04475 EJD
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANTS' MOTION TO STRIKE